891 So.2d 1268 (2005)
Ginger BAILEY, et al.
v.
Dr. Gregory KHOURY, et al.
Nos. 2004-CC-0620, 2004-CC-0647, 2004-CC-0684.
Supreme Court of Louisiana.
January 20, 2005.
*1270 Adams and Reese, Edward J. Rice, Jr., Arthur F. Hickham, Jr., New Orleans, Counsel for Applicant in No. 2004-CC-0620.
Mang, Batiza, Godofsky & Penzato, Deborah I. Schroeder, Nakisha Ervin-Knott, The Truitt Law Firm, Jack E. Truitt, Madisonville, Broussard and Associates, Kevin K. Gipson, Martin L. Broussard, Jr., New Orleans, Hemelt & Foshee, Deborah C. Foshee, Covington, Seale, Daigle & Ross, Mark E. Seamster, Covington, Counsel for Respondent in No. 2004-CC-0620.
Mang, Batiza, Godofsky & Penzato, Deborah I. Schroeder, Nakisha Ervin-Knott, Counsel for Applicant in No. 2004-CC-0647.
Adams and Reese, Edward J. Rice, Jr., Arthur F. Hickham, Jr., New Orleans, The Truitt Law Firm, Jack E. Truitt, Madisonville, Broussard and Associates, Kevin K. Gipson, Martin L. Broussard, Jr., New Orleans, Hemelt & Foshee, Deborah C. Foshee, Covington, Seale, Daigle & Ross, Mark E. Seamster, Covington, Counsel for Respondent in No. 2004-CC-0647.
The Truitt Law Firm, Jack E. Truitt, Madisonville, Counsel for Applicant in No. 2004-CC-0684.
Adams and Reese, Edward J. Rice, Jr., Arthur F. Hickham, Jr., New Orleans, Mang, Batiza, Godofsky & Penzato, Deborah I. Schroeder, Nakisha Ervin-Knott, Broussard and Associates, Kevin K. Gipson, Martin L. Broussard, Jr., New Orleans, Hemelt & Foshee, Deborah C. Foshee, Covington, Seale, Daigle & Ross, Mark E. Seamster, Covington, Counsel for Respondent in No. 2004-CC-0684.
CALOGERO, Chief Justice.
Rapid advances in many scientific disciplines have led to the application of new methods and technologies in every aspect of medicine. Often these new capabilities require fundamental changes in legal analysis or raise legal questions that never before have required consideration.[1]
This case aptly demonstrates the truth of the above statement, as the primary issue involves the impact on the parties' rights, of information gained from advances in medical technology that raises a legal question "that never before [has] required consideration." In fact, our research indicates that the issue presented may be one of first impression, not only in the State of Louisiana, but in every legal jurisdiction in the United States. The court in this case is called upon to decide whether the time limitation for filing a claim seeking recovery of damages arising from birth defects can be considered to commence at a time prior to the child's live birth when, because of information gained *1271 from an ultrasound of the fetus, the unborn child's parent was told both that the child had birth defects and that those defects were probably caused by the mother's ingestion of drugs prescribed and dispensed by defendants. This argument is only the most recent of many creative legal arguments flowing from rapidly-changing medical and scientific advances which, over the last century, have transformed the legal principles applicable to liability for birth defects and prenatal injuries.[2]
The plaintiff in this case is the mother of a child who suffered birth defects, allegedly as a result of her ingestion of the prescription drug Depakote during the early days of her pregnancy. The mother filed suit in medical malpractice against various health-care providers who prescribed the drug, and in tort against various pharmacies that dispensed the drug, both in her individual capacity and in her representative capacity on behalf of the child. We granted these consolidated applications for supervisory writs to determine whether prescription on both of the plaintiff's claims commenced, as the defendants claim, on the date prior to the child's birth when the mother was told that the child would have defects at birth, probably resulting from her ingestion of Depakote during pregnancy, or, as the plaintiff claims, on the later date when the child was born, or whether different prescriptive periods might apply to the plaintiff's two claims. A divided panel of the court of appeal held that prescription commenced on the mother's claim on behalf of the child, and on the mother's individual claim, on the date of the child's birth. Accordingly, the court of appeal affirmed trial court judgments denying exceptions of prescription filed by the defendants. The court of appeal did not differentiate between the two claims in its decision.
For the reasons explained below, we agree with the court of appeal's holding that prescription on both the mother's claim on behalf of the child and the mother's individual claim commenced on the later of the two dates  i.e., the date when the child was born. Because the mother's original petition regarding the two claims was filed less than a year from the date of the child's birth, we affirm the court of appeal judgment denying defendants' peremptory exceptions of prescription.

FACTS AND PROCEDURAL HISTORY
Plaintiff, Ginger Bailey, a psychiatric patient with a long history of treatment and hospitalization for bipolar disorder, had been treated with various prescription medications over the years. From the date of her diagnosis sometime around 1991 until 1997, Ms. Bailey was treated by various physicians and mental health facilities throughout the greater New Orleans area. During that entire period, during *1272 which Ms. Bailey had two children, she was taking various types of drugs to treat her symptoms, which included hallucinations, paranoia and depression. Neither of her two eldest children suffered any adverse effects arising from her ingestion of the various medications.
In March 1997, Dr. Robert Ancira at Transitional Hospital Corp. of New Orleans ("THC") prescribed Depakote, which is "one of the most widely prescribed anti-seizure drugs," primarily used to treat epilepsy, but also used to treat bipolar disorder.[3] When Dr. Gregory Khoury at Jo Ellen Smith Psychiatric Center later became Ms. Bailey's treating physician, he continued to prescribe Depakote. Ms. Bailey purchased her prescription drug, Depakote, from Walgreen's Louisiana Co., Inc. and Eckerd Corporation. Depakote "has been linked to birth defects and lower IQs among children exposed to it in the womb," with the most common birth defect being spina bifida.[4] Despite the fact that she was of child-bearing age, Ms. Bailey claims that none of the defendant physicians or pharmacies warned her of the dangers of birth defects arising from the use of Depakote during pregnancy. Ms. Bailey further claims that she had never been told during her years of treatment that any of the drugs she was taking to treat her symptoms could cause birth defects.
Several months after she first started taking Depakote, in late July or early August 1997, Ms. Bailey learned that she was pregnant with her third child. At that time, Ms. Bailey was advised by a nurse at the New Orleans Mental Health Center to discontinue all medications and to contact an obstetrician. The pregnancy was confirmed by an obstetrician, Dr. Wayne Grundmeyer, who advised Ms. Bailey on September 25, 1997, of the risk that her child would suffer birth defects caused by the drugs used during her pregnancy, particularly her use of Depakote. Dr. Grundmeyer's fears were confirmed when an ultrasound[5] performed by Dr. Thomas Albert on October 25, 1997, revealed that Ms. Bailey's unborn child had developed birth defects (specifically, a neural tube defect[6]) and that the child would probably *1273 suffer a number of complications. On November 28, 1997, Ms. Bailey was informed that her unborn child had developed birth defects and that the child's condition had probably been caused by valproic acid exposure[7] resulting from her use of Depakote. Ms. Bailey was further advised that she should have been counseled against becoming pregnant while taking that medication.
On March 20, 1998, Jada Nacaya Bailey was delivered by caesarian section. At birth, Jada suffered from a number of defects, including Cornelia de lange syndrome,[8] spina bifida,[9] and hydrocephalus,[10] with accompanying features and symptomology, including paralysis from the waist down and loss of muscle control. Almost a year after Jada's birth, on March 17, 1999, Ms. Bailey, individually and in her representative capacity on behalf of Jada, filed a medical malpractice action against Dr. Khoury, Jo Ellen Smith Psychiatric Center, Dr. Ancira, and THC, alleging failure to warn of known side effects of Depakote, as well as other acts of medical malpractice. In her petition, Ms. Bailey made the following allegations relative to damages:
That petitioner contends she is entitled to damages which would compensate the minor child and her for the severe disabling injuries received as well as any and all medical expenses incurred, either in the past, present and/or future; mental and physical anguish endured, past, present and future; loss of quality of life; as well as, loss of possibility of earning potential and income, past present and future; and permanent disability of the minor child. Additionally, claimant is entitled to damages for any resulting disabilities on behalf of the minor child and for any other damages to which she and the minor child may be entitled under the jurisprudence of the State of Louisiana.
Two days later, on March 19, 1999, Ms. Bailey filed her first amending and supplemental petition, naming Walgreens and Eckerd as tort defendants, alleging that they were solidarily liable with the medical *1274 malpractice defendants named in her original petition.
Dr. Ancira filed an exception of prematurity based on the provisions of La.Rev.Stat. 40:1299.47(B)(1)(a), which requires that medical malpractice actions be presented to a medical review panel prior to the filing of suit. Dr. Ancira was subsequently dismissed by consent of the parties. Dr. Khoury was also dismissed without prejudice on Ms. Bailey's motion. Ms. Bailey later filed a Petition to Institute Discovery in the medical review panel proceeding.[11]
Walgreens filed a peremptory exception of prescription, arguing that the one-year prescriptive period on the tort claims filed by Ms. Bailey, individually and on behalf of Jada, commenced when the ultrasound confirmed the suspected birth defects and Ms. Bailey was informed of those defects, on or shortly after October 28, 1997 (some six months before Jada was born). Eckerd later filed a motion for summary judgment,[12] seeking dismissal of Ms. Bailey's claims on the basis of prescription.
Dr. Khoury filed an exception of prescription in the medical review panel discovery suit, citing the provisions of La.Rev.Stat. 40:1299.47(B)(2)(a), which allow a qualified health-care provider to raise such an exception during the pendency of the medical review panel proceeding. Dr. Ancira and Jo Ellen Psychiatric Center filed similar exceptions.
The two district court judges to whom the proceedings were assigned denied the exceptions of prescription. Defendants filed applications for supervisory writs in the court of appeal. A three-judge panel of the court of appeal initially reversed the district courts' denial of defendants' peremptory exceptions of prescription, granted the exceptions, and dismissed Ms. Bailey's lawsuits, with one judge dissenting. Bailey v. Khoury, 02-0049 (La.App. 4 Cir. 8/28/02), 840 So.2d 582. Because that judgment was signed by only two court of appeal judges, rather than three, as mandated by La. Const. art. V, § 8(b) when a court of appeal panel reverses a district court judgment, this court granted Ms. Bailey's writ application, vacated the court of appeal decision, and remanded the case to the court of appeal for reargument before a five-judge panel. Bailey v. Khoury, 03-0165 (La.4/4/03), 845 So.2d 1037. A five-judge panel of the court of appeal then disposed of the matter, "Writs denied, judgments affirmed," and coupled that disposition with an opinion authored by Judge McKay, affirming the district courts' denials of the defendants' exceptions of prescription. Bailey v. Khoury, 02-0049 (La.App. 4 Cir. 2/18/04), 868 So.2d *1275 821 (on remand). Thereafter, this court granted and consolidated defendants' applications for supervisory writs. Bailey v. Khoury, 04-0620, 04-0647, 04-0684 (La.5/7/04), 872 So.2d 1073, 1074.

PRESCRIPTION IN MEDICAL MALPRACTICE CASES
Prescription in medical malpractice actions is governed by the provisions of La.Rev.Stat. 9:5628, which provides, in pertinent part, as follows:
A. No action for damages for injury or death against any physician, chiropractor, nurse, licensed midwife practitioner, dentist, psychologist, optometrist, hospital or nursing home duly licensed under the laws of this state, or community blood center or tissue bank as defined in R.S. 40:1299.41(A), whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect.
B. The provisions of this Section shall apply to all persons whether or not infirm or under disability of any kind and including minors and interdicts.
This court has previously noted that La.Rev.Stat. 9:5628 sets forth more than one prescriptive period, because it "initially... coincides with La. Civ.Code art. 3492's basic one year prescriptive period for delictual actions, coupled with the `discovery' exception of our jurisprudential doctrine of contra non valentem." Campo v. Correa, 01-2707, p. 8 (La.6/21/02), 828 So.2d 502, 508, quoting Hebert v. Doctors Memorial Hospital, 486 So.2d 717, 723 (La.1986).
Generally, prescription statutes are strictly construed against prescription and in favor of the claim sought to be extinguished by it. Bouterie v. Crane, 616 So.2d 657, 660 (La.1993). The burden of proof on the prescription issue lies with the party asserting it unless the plaintiff's claim is barred on its face, in which case the burden shifts to the plaintiff. Id. See also Campo, 01-2707 at p. 7, 828 So.2d at 508. In Campo, we concluded that "a petition should not be found prescribed on its face if it is brought within one year of the date of discovery and facts alleged with particularity in the petition show that the patient was unaware of the malpractice prior to the alleged date of discovery, and the delay in filing suit was not due to willful, negligent, or unreasonable action of the patient." Id. at 9, 828 So.2d at 509. Applying the rule set forth in Campo, we find that Ms. Bailey's original petition was not prescribed on its face because it "makes a prima facie showing that it was filed `within one year from the date of discovery' and [incidentally] `within a period of three years from the date of the alleged act, omission, or neglect.'" Id. at 10, 828 So.2d at 509. Thus, defendants bear the burden of proving that Ms. Bailey's claims are barred by prescription.
"Prescription cannot run against a cause of action that has not accrued or while that cause of action cannot be exercised." Wilkinson v. Wilkinson, 323 So.2d 120, 125 (La.1975). Under Louisiana law, for a negligence cause of action to accrue, three elements are required: fault, causation and damages. Austin v. Abney Mills, Inc., XXXX-XXXX (La.9/4/02), 824 So.2d 1137, 1148. Further, liberative prescription of one year generally begins to run when the victim knows or should know of the damage, the delict and the relationship between them. Branch v. Willis-Knighton Medical Center, 92-3086, p. 1 *1276 (La.4/28/94), 636 So.2d 211, 212. Stated another way, prescription "commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort." Campo, 01-2727 at 11, 828 So.2d at 510. This court held in Campo that the "ultimate issue" in determining whether a plaintiff had constructive knowledge of a malpractice action is "the reasonableness of the patient's action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct." Id. at 12, 828 at 511.
Moreover, La. Civ.Code art. 3492, relative to prescription in tort actions, specifically provides that the prescriptive period "commences to run from the day injury or damage is sustained." That provision has been explained by this court as follows:
[La. Civ.Code art. 3492] is rooted in the recognition that a prescriptive period is a time limitation on the exercise of a right of action, and a right of action in tort comes into being only when the plaintiff's right to be free of illegal damage has been violated. When damages are not immediate, the action in damages thus is formed and begins to prescribe only when the tortious act actually produces damage and not on the day the act was committed.
The damage suffered must at least be actual and appreciable in quality  that is, determinable and not merely speculative. But there is no requirement that the quantum of damages be certain or that they be fully incurred, or incurred in some particular quantum, before the plaintiff has a right of action. Thus, in cases in which a plaintiff has suffered some but not all of his damages, prescription runs from the date on which he first suffered actual and appreciable damage, even though he may thereafter come to a more precise realization of the damages he has already incurred or incur further damage as a result of the completed tortious act.
Harvey v. Dixie Graphics, Inc., 593 So.2d 351, 354 (La.1992) (citations omitted). Thus, damage is considered to have been sustained, within the meaning of La. Civ.Code art. 3492, only when it has manifested itself with sufficient certainty to support accrual of a cause of action. Cole v. Celotex Corp., 620 So.2d 1154, 1156 (La.1993). Because, as this court held in Hebert and Campo, La.Rev.Stat. 9:5628, the prescription provision for medical malpractice actions, "initially coincides with" the general prescriptive period for delictual actions set forth in La. Civ.Code art. 3492, the above principles apply to determine when the prescriptive period commences in a medical malpractice action. Thus, the primary question we must answer in order to decide the issues presented by this case is the date when the claims asserted by Ms. Bailey accrued.

Defendants' arguments in favor of prescription
Defendants' arguments in support of their exceptions of prescription are based primarily on the following provisions of the Louisiana Civil Code:
Art. 24 Kinds of persons
There are two kinds of persons: natural and juridical persons.
A natural person is a human being....
Art. 25. Commencement and end of natural personality
Natural personality commences from the moment of live birth and terminates at death.
Art. 26. Unborn child
An unborn child shall be considered as a natural person for whatever relates to its interests from the moment of conception. *1277 If the child is born dead, it shall be considered never to have existed as a person, except for purposes of actions resulting from its wrongful death.
Art. 27. General legal capacity
All natural persons enjoy general legal capacity to have rights and duties.
* * * * *
Art. 3468. Persons against whom prescription runs
Prescription runs against all persons unless exception is established by legislation.
Art. 3468. Incompetents
Prescription runs against absent persons and incompetents, including minors and interdicts, unless exception is established by legislation.
Applying the above provisions together, defendants argue that an unborn child who is later born alive is considered a natural person from the time of its conception, and that prescription runs against an unborn child prior to its birth, at least under some circumstances. Because Ms. Bailey is Jada's legal representative, and because Jada, who was born alive, is considered to have been a natural person from the time of her conception, defendants argue that, under the rules discussed above, prescription commenced on Ms. Bailey's claim on behalf of Jada when Ms. Bailey knew or should have known of the damage, the delict and the relationship between them, or by October 28, 1997.
In further support of their position, defendants argue that this court's decision in Malek v. Yekani-Fard, 422 So.2d 1151 (La.1982), stands for the proposition that prescription on a claim for in utero injuries to an unborn child begins before the child's birth. In Malek, this court allowed the mother of an illegitimate child to file suit to establish paternal filiation and obtain support prior to the child's birth. Id. The question of prescription was not raised in the Malek case. Further, the rights asserted in Malek were property rights, not personal rights, like the rights asserted by Ms. Bailey on behalf of Jada in this case
Defendants also point to this court's opinions in Danos v. St. Pierre, 402 So.2d 633 (La.1981) (on rehearing) and Adams v. Denny's, Inc., 464 So.2d 876 (La.App. 4 Cir.1985). In Danos, this court held on rehearing that parents may recover wrongful death damages from a tortfeasor whose negligence caused injury to their unborn child, subsequently born dead because of the injury. 402 So.2d 633. In Adams, the court of appeal, applying Danos, found that a cause of action for an unborn child's wrongful death against its mother's employer was not subject to the exclusivity provisions of the workers' compensation statute. 464 So.2d at 878. Close review of the Danos and Adams cases reveals however that they have no application to the salient issue in this case because nothing in either case indicates that suit was filed prior to the child's birth. Further, neither case stands for the proposition argued by defendants that prescription in a claim to recover damages arising from birth defects commences when the child's parent becomes aware of the existence and cause of the birth defects. In fact, both the Danos and Adams cases were apparently filed after the child was born dead.
Finally, defendants note the court's holding in In re Medical Review panel for the Claim of Derek Dede, 98-2248 (La.App. 4 Cir. 12/2/98), 729 So.2d 603, that the knowledge of the parent determines when prescription commences on a minor child's medical malpractice claim. Ultimately, defendants argue that Louisiana law contains absolutely no support for Ms. Bailey's argument that an unborn child should be treated differently from other natural persons for purposes of prescription.

*1278 Court of appeal opinion
In the case under consideration, the court of appeal disagreed with the defendants' arguments, concluding as follows:
Jada Nacaya Bailey is a natural person. Therefore, she enjoys the general legal capacity to have rights and duties. Although Jada has been considered a natural person from the moment of her conception and was able to acquire a cause of action while she was in utero, she would not be able to pursue this action until she was born. Logic, therefore, dictates that any cause of action that may be brought on her behalf for injuries she suffered in utero would not prescribe until one year from the date of her birth.
02-0049 at 3, 868 So.2d at 823. Justice Pro Tempore Landrieu concurred in the court of appeal decision, noting the language of La. Civ.Code art. 26 "that an unborn child shall be considered a natural person for whatever relates to its interests from the moment of conception," and concluded that the article was "clearly enacted to protect unborn children and not to disadvantage them." 02-0049 at 1, 868 So.2d at 824 (emphasis added).

PRESCRIPTION ON PLAINTIFFS' CLAIMS
We note at the outset that the court of appeal decision affirming the district court judgments that denied the defendants' exceptions of prescription is based on the unstated assumption that prescription on Ms. Bailey's individual claim and prescription on Ms. Bailey's claim on behalf of Jada commenced on the same day, and should be governed by similar legal arguments and principles. Despite the fact that the medical malpractice defendants separated the two claims in the discussion sections of their memorandums supporting their exceptions of prescription in the district court, none of the lower court decisions separates the two causes of action, and the defendants do not clearly distinguish them in their briefs to this court. However, given the applicable law and the procedural posture of the case, we find it necessary to consider the two causes of action separately.

Ms. Bailey's claims on behalf of Jada
As indicated in the introduction to this opinion, the specific argument set forth by the defendants is apparently unique in the reported case law. In fact, we have not discovered any reported cases that have considered an argument that, under the discovery rule, the statutory period for filing suit seeking damages arising from birth defects or other prenatal injuries should commence on a date prior to the child's birth when the parent acquired knowledge of the birth defects as a result of a medical procedure. Rather, the reported cases generally fall into two categories: (1) those holding that the statutory period for filing suit commences on the date of the child's birth,[13] and (2) those applying the discovery rule and holding that the statutory period for filing a suit for damages arising from birth defects or other prenatal injuries does not begin until the date after the child's birth when the cause of the birth defects was discovered.[14] A review of the cases indicates that the latter rule is often applied to claims that *1279 birth defects were caused by the mother's ingestion of drugs during pregnancy.
The first rule has been applied in a number of Louisiana cases when some specific circumstance attendant to the child's birth provided the parent notice that the child had suffered injury related to negligent medical care. See Tucker v. Lain, 98-2273 (La.App. 4 Cir. 9/5/01), 798 So.2d 1041, writ denied, 01-2715 (La.1/4/02), 805 So.2d 210; Richardson v. Moffett, 608 So.2d 275 (La.App. 3 Cir.1992), writ denied, 612 So.2d 81 (La.1993); Maung-U v. May, 556 So.2d 221 (La.App. 2 Cir.), writ denied, 559 So.2d 1385 (La.1990); Percy v. State of Louisiana, 478 So.2d 570 (La.App. 2 Cir.1985). The second rule has also been widely applied to Louisiana cases in which the cause of a birth defect apparent at delivery was discovered sometime after the birth. See Bailey v. Haynes, 37,038 (La.App. 2 Cir. 4/9/03), 843 So.2d 584 writ denied, 03-1209 (La.10/10/03), 856 So.2d 1207; Adams v. Louisiana Medical Mutual Insurance, 33,030 (La.App. 2 Cir. 4/7/00), 756 So.2d 708, writs denied, 00-1313, 00-1322 (La.6/30/00), 766 So.2d 540; LeCompte v. State of Louisiana, 97-1878 (La.App. 1 Cir. 9/25/98), 723 So.2d 474; Welch v. St. Francis Medical Center, Inc. 521 So.2d 758 (La.App. 2d Cir.), writs denied, 524 So.2d 513 La.1988); Poole v. Physicians & Surgeons Hospital, 516 So.2d 1185 (La.App. 2 Cir.1987), writs denied, 519 So.2d 127, 128 (La.1988).
Although none of the cases listed above address the exact issue presented in this case, a review of those cases reveals that medical malpractice cases involving birth defects and other prenatal injuries involve unique problems, not necessarily present in other medical malpractice cases. In fact, it has been recognized that such cases differ from other medical malpractice cases in "several significant ways." Jennifer M. Chow,"Civil Practice Law and Rules," 69 St. John's L.Rev. 675, 679 (1995). Those differences have been generally described as follows:
First, unborn children have never been recognized as "persons" in a legal sense. Second, unlike claimants in other medical malpractice cases, an unborn child cannot bring a claim when the act occurs, but must wait until birth. Third, the tortious act in a prenatal injury case creates conditional prospective liability which only attaches if the child is born alive.
Id. (Footnotes omitted.) These differences, Ms. Chow suggests, must be considered in order to determine when a cause of action for medical malpractice resulting in birth defects or other prenatal injuries accrues.
Actually, determination of the accrual date of a cause of action for medical malpractice resulting in birth defects or other prenatal injuries in this case is facilitated by the fact that Louisiana is one of only a few jurisdictions in the United States that has adopted specific legal provisions relative to the rights of unborn children subsequently born alive.[15] Thus, the first of the three "differences" listed by Ms. Chow between medical malpractice cases involving birth defects and other medical malpractice cases is not present in this case. La. Civ.Code art. 26 specifically provides that "[a]n unborn child shall be considered as a natural person for whatever relates to its interests from the moment of conception," unless it is born dead, in which case "it shall be considered never to have existed as a person, except for purposes of actions resulting from its wrongful death." We find that the accrual of Ms. Bailey's claim on behalf of Jada is controlled by the language of La. Civ.Code art. 26, coupled with its legislative history.
*1280 La. Civ.Code arts. 24 through 27, all cited by the defendants, are found in Louisiana Civil Code, Book I, Title I, which relates to "Natural and Juridical Persons." Title I of Book I of the Civil Code was most recently amended by Act 125 of the 1987 Acts of the Louisiana Legislature. The amendments adopted by the Legislature as part of Act 125 (1987) were recommended by the Louisiana State Law Institute in a report from its meeting that occurred on October 10 through 11, 1986, prepared by Professor A.N. Yiannopoulos. The Reporter appended comments to the Institute's recommendation that the legislature adopt the provision now designated as La. Civ.Code art. 26, which provides that "[n]atural personality commences from the moment of live birth and terminates at death." Those comments included the following excerpt from Yiannopoulos, Louisiana Civil Law System, § 50 (1977):
The personality of natural persons commences at the moment of birth, that is, at the moment in which a child is completely separated from the body of its mother. Until that time, the child has no distinct life; as the Romans said, it is merely pars viscerum matris. But, by virtue of a legal fiction, an unborn child is considered to possess personality, as if it had already been born, when this is to its advantage: nasciturus pro nato habetur, quoties de commodis ejus agitur. This idea is expressed in Article 29 of the Louisiana Civil Code of 1870, which declares that "Children in the mother's womb are considered, in whatever relates to themselves, as if they were already born; thus, the inheritances which devolve to them before their birth, and which may belong to them, are kept for them, and curators are assigned to take care of their estates for their benefit."
The anticipated personality of an unborn child produces various civil effects. In addition to the right of inheritance and the appointment of a curator, mentioned in Article 29 of the Civil Code, a posthumous child may have a cause of action under the workmen's compensation law or under the law of delictual obligations for the wrongful death of its father. Moreover, an unborn child may have a right to recover damages for prenatal injuries, namely personal injuries suffered en ventre de sa mere. It should be kept in mind, however, that the personality of the unborn child is recognized only for the preservation of its interests. Thus, while an illegitimate child may be recognized before its birth, an action for disavowal of paternity must be brought after the child is born.
(Emphasis added.)
We realize that the comments of the Institute Reporter do not carry the weight of law, and that the Yiannopoulos article quoted by the Institute Reporter discussed Louisiana Persons law as it existed prior to the 1987 amendments to La. Civ.Code art. 26. We nevertheless find them persuasive evidence of the intention of the Legislature when it adopted the current version of La. Civ.Code art. 26 in 1987, especially in light of the fact that the Official Legislative Comments to the 1987 amendment specifically state that the provision "does not change the law," as noted by this court in Wartelle v. Women's and Children's Hospital, 97-0744, p. 9 (La.12/2/97), 704 So.2d 778, 783.
In Wartelle, a case that involved a different legal issue than is here involved, we noted that La. Civ.Code art. 26 applies only to "matters that advance the interests of the fetus," consistent with Professor Yiannopoulos's comments. Therein we said that La. Civ.Code art. 26 "accords to an unborn fetus provisional legal personality for its own interests conditioned on its *1281 subsequent live, birth, such that it can acquire a cause of action and inherit while en ventre sa mere," but that the article "does not confer actual legal personality; it provides that the fetus shall only be `considered' as a natural child and it limits the fictional personality of the fetus to matters that advance the interests of the fetus." Id. at 4, 704 So.2d at 781 (italics in original; boldface emphasis added).[16]
Ultimately then, Louisiana law belies defendants' argument that Louisiana law contains no support for Ms. Bailey's argument that an unborn child should be treated differently from other natural persons for purposes of prescription. In fact, Louisiana law specifically provides that the "legal fiction" of natural personality that attaches to an unborn child from the moment of conception pursuant to La. Civ.Code art. 26 applies only when such application is for the benefit of the child or for the preservation of its interests, as in the Malek case in which the court allowed the mother to assert the filiation and support action prior to the child's birth.
It follows logically that the "legal fiction" of the unborn child's natural personality from the date of conception established by La. Civ.Code art. 26 does not attach when its application does not inure to the benefit of the child or for the preservation of its interests, and particularly when applying that "legal fiction" would be to the child's detriment, as here. Certainly applying the "legal fiction" to hold that prescription commenced at some point prior to the child's birth when the mother became aware of the existence of its birth defects would not inure to either the benefit of the child or the preservation of its interests. The language of La. Civ.Code art. 26 that an unborn child is to be "considered as a natural person for whatever relates to its interests from the moment of conception" is an "exception ... established by legislation" to the general rule set forth in La. Civ.Code art. 3468 that prescription runs against minors and incompetents. Further, none of the cases cited by defendants demands a different result. Thus, we hold that Ms. Bailey's claim filed on behalf of Jada accrued on March 20, 1997, the date Jada was born, and that prescription on that claim therefore commenced on that date.
In order to reach our conclusion in this case, we rely heavily on the fact that the "legal fiction" of natural personality conferred upon an unborn child by La. Civ.Code art. 26 applies only to "whatever relates to its interests." In that regard, this decision may be seen as a logical extension of a much earlier Louisiana case  i.e., Cooper v. Blanck, 39 So.2d 352 (La.App.Orl.1923). In that case, the court held, contrary to most reported decisions at the time, that an unborn child subsequently born alive has a cause of action for prenatal injuries. Id. In so holding, the Cooper court relied on La. Civ.Code art. 29, which then declared that "children in their mother's womb are, in whatever relates to themselves, considered as if they were already born." Id. at 360 (emphasis added). Focusing on the phrase "in whatever relates to themselves," the court rejected the argument that the article applied only to successions, and found that the phrase was of the "the most sweeping character." Id.
A California court reached a similar conclusion in Scott v. McPheeters, 33 Cal.App.2d 629, 92 P.2d 678 (1939), which involved a suit for injuries sustained by a *1282 child prior to its birth as a result of the alleged malpractice of a physician in negligently using metal clamps and forceps in connection with the child's delivery. At that time, Cal. Civ.Code art. 29 stated as follows: "A child conceived, but not yet born, is to be deemed an existing person, so far as may be necessary for its interests in the event of its subsequent birth." Id. at 630, 92 P.2d 678. The language and effect of this article is very similar to La. Civ.Code art. 26. The Scott court rejected an argument that the word "interests" in the codal article should be limited in its application to the child's right of inheritance or to its property rights, and not applied to grant the child a right of action for a tort committed prior to its birth. Id. at 631, 92 P.2d 678. The court found that the provision was "as clear and concise as the English language could make it," and that the word "interests" should therefore be interpreted to include "both personal and property rights." Id. See also Norman v. Murphy, 124 Cal.App.2d 95, 268 P.2d 178. Because the language in La. Civ.Code art. 26 is also "as clear and concise as the English language can make it," we find that it protects both the personal and property rights of the unborn child subsequently born alive.
The rule established by this case is also consistent with cases from other jurisdictions that, like Louisiana, have express statutory provisions conferring natural personality on unborn children subsequently born alive. Many of those cases have relied upon previous decisions establishing a general rule for when a cause of action accrues, which typically occurs when all of the factual elements of the tort are present. See Chow, supra.[17] For example, in Wilson v. Kaiser Foundation Hospitals, 141 Cal.App.3d 891, 190 Cal.Rptr. 649 (1983), the court found that, under such a provision, live birth is a "condition precedent" to accrual of legally cognizable rights. Id. Applying the same principle, the court in Simmons v. Weisenthal, 29 Pa. D. & C.2d 54, 1962 WL 6989 (Pa.Com.Pl.1962), found that the statute of limitations does not commence in cases involving injuries to unborn children until the date of the child's birth. In so holding, the court stated as follows:
It is apparent that liability for a prenatal injury attaches at the earliest possible time upon birth of the infant, whether recovery is allowed for a live or a still birth. If liability does not attach until birth, whether alive or still, there is what has been termed "an implied condition" that the child be born. We do not see, therefore, how the statute of limitations can possibly begin to run until fulfillment of the implied condition that the child be born, at which time liability will attach. Until there is liability there can be no right upon which an action could be brought, and until a right exists the statute cannot run.
Id. at 55-56. See also Cosgrove v. Merrell Dow Pharmaceuticals, Inc., 117 Idaho 470, 788 P.2d 1293 (1990).
Under general Louisiana law, a cause of action accrues when a party has the right to sue. Falgout v. Dealers Truck Equipment Co., XXXX-XXXX, p. 12 (La.10/19/99), 748 So.2d 399, 407. Because La. Civ.Code art. 26 imposes an "implied condition" of live birth on an unborn child's right to be considered a "natural person," we find that a cause of action for damages arising from *1283 prenatal injuries does not accrue until the child's live birth. This is especially true since, under the provisions of La. Civ.Code art. 26, tortfeasors have no liability for prenatal damages unless and until the child is born alive. Because the cause of action does not accrue until that date, prescription does not commence until that date. Accordingly, the lower courts properly denied the defendants' peremptory exceptions of prescription regarding Ms. Bailey's claim filed on behalf of her child, Jada.

Ms. Bailey's individual claim
In oral argument, defendants took the position that, even if prescription on the claims filed by Ms. Bailey on behalf of Jada did not commence until her birth, prescription on Ms. Bailey's individual claim commenced on the date prior to Jada's birth when Ms. Bailey learned that her unborn child had developed birth defects. This argument is based on the defendants' position that Ms. Bailey had actual or constructive knowledge of the tortious act, the damage and the causal relation between the tortious act and the damage on that day. See LeCompte, 97-1878, 723 So.2d 474. According to defendants, Ms. Bailey's knowledge of both the existence of the birth defects and the suspected cause of the birth defects, coupled with her testimony that she was upset when she gained that knowledge, is sufficient to commence prescription under the discovery rule governing prescription in medical malpractice claims established by La.Rev.Stat. 9:5628.
In support of their argument, defendants attached to their memoranda in support of their exceptions Ms. Bailey's June 12, 2001 deposition (or portions thereof). In that deposition, Ms. Bailey admitted that, immediately after her pregnancy was confirmed, she was informed of the risks of birth defects related to use of Depakote during pregnancy. Ms. Bailey further conceded that she knew that Jada had birth defects probably caused by her use of Depakote at least by October 28, 1997, when Dr. Grundmeyer told her both that her child had developed birth defects and that the defects were probably caused by her ingestion of Depakote early in her pregnancy. When asked how she felt when she learned that her unborn child had birth defects, Ms. Bailey replied that she was "messed up" and upset. Ms. Bailey also said that she considered having an abortion, despite the fact she did not believe in abortion. According to Ms. Bailey, her pregnancy with Jada was "rough" because she was sick all the time and unable to eat, and she also experienced greater depression than normal.
In this case, we have struggled to find a logical and equitable legal solution to the matter of accrual of Ms. Bailey's individual claim and the corresponding commencement of prescription. Although a finding that prescription commenced on Ms. Bailey's individual claim before Jada's birth would not raise the same equitable concerns as those raised by a finding that her claim on behalf of Jada commenced prior to Jada's birth, we nevertheless find that the twin goals of consistency and predictability would be better served through holding that the claims accrue on the same date. Because Ms. Bailey is the plaintiff in both claims, and because both claims allege the same negligent acts (failure to warn), the determination of when prescriptive commences on the two claims should not turn upon which hat Ms. Bailey happens to be wearing. Further, a finding that prescription commenced on Ms. Bailey's individual claim at the same time it commenced on her claim on behalf of Jada provides the additional benefit of a clear, predictable benchmark, and relieves a pregnant plaintiff of the burden of worrying about the need to pursue potential legal claims during a difficult pregnancy. *1284 Finally, and most importantly, proper application of the applicable legal principles to the facts surrounding Ms. Bailey's claim does not support the conclusion urged by the defendants. For the reasons explained below, we therefore reject the defendant's argument that Ms. Bailey's claims accrued on the date she was told that her unborn child had birth defects probably caused by her ingestion of Depakote.
Reduced to its essence, defendants' argument is that knowledge of the birth defects and their probable cause, coupled with Ms. Bailey's testimony that she was upset when she gained that knowledge, is sufficient to commence prescription under the discovery rule. We disagree. As is evident from the principles governing application of the discovery rule discussed above in the introduction to the section entitled "Commencement of Prescription," determination of the date when a cause of action in a medical malpractice action accrues is more complicated than the defendants suggest. In fact, determination of when prescription commences under the discovery rule depends on at least two primary factors: (1) the date on which the plaintiff gained actual or constructive knowledge of "facts indicating to a reasonable person that he or she is the victim of a tort," Campo, 01-2707 at 11, 828 So.2d at 510; and (2) the date on which the "tortious act actually produces damage." Harvey, 593 So.2d at 354. Both knowledge and damages must be present for prescription to commence, and, as will be shown, the two factors work together in this case. Defendants' argument focuses on the first of these factors, while virtually ignoring the second.
When applying the above principles to the facts of a particular case, we must also keep in mind the general precepts governing determination of exceptions of prescription. For example, the above principles must be applied in light of the precept that the burden of proof on the prescription issue rests with the party pleading prescription. See Bouterie, 616 So.2d at 660. Further, prescription statutes are to be strictly construed against prescription and in favor of the obligation sought to be extinguished. Id. Determination of when prescription commences under the discovery rule is a fact-intensive inquiry. Stansbury v. Accardo, 2003-2691, p. 3 (La.App. 1 Cir. 10/29/04), ___ So.2d ___, 2004 WL 2415903, citing Campo.
Concerning the first factor set forth above (the date plaintiff gained knowledge she was the victim of a tort), Ms. Bailey clearly testified in her deposition that she had actual knowledge that her unborn child had developed birth defects at least by October 28, 1997, because Dr. Grundmeyer had told her that the ultrasound revealed those defects. Further, when asked how she felt when she was told about the birth defects, Ms. Bailey stated that she was "messed up" and upset. The question is whether this testimony presented by the defendants is sufficient to carry their burden of proving that Ms. Bailey's individual claim filed more than a year after she gained that knowledge is barred by prescription. The "ultimate question" that we must answer is whether, possessing this knowledge, Ms. Bailey's delay in filing suit seeking recovery of her individual damages, including pain and suffering, was reasonable, "in light of [her] education, intelligence, the severity of the symptoms, and the nature of defendant's conduct." Campo, 01-2707 at 12, 828 So.2d at 511.
This issue is not as straightforward as it might seem. Primarily, we are troubled by the fact that Ms. Bailey's testimony is imprecise concerning the extent of information she was given on October 28, 1997. Ms. Bailey's deposition reveals that she was told that her unborn child had developed *1285 "birth defects," but that undisputable fact does not necessarily mean that she immediately obtained "actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort," as required for application of the discovery rule. Id. at 11, 828 So.2d at 510. The phrase "birth defect" can be widely applied to any number of perceived imperfections in a newborn child, and nothing in Ms. Bailey's testimony indicates that she was told that her unborn child had suffered a "neural tube defect," that the child had spinal bifida, or that the child would be paralyzed from the waist down and suffer loss of motor control and other symptoms. Ms. Bailey's deposition is silent concerning the details of the knowledge she received. We find that Ms. Bailey's deposition testimony is insufficient to carry the defendants' burden of proving that, on November 28, 1997, Ms. Bailey gained actual or constructive knowledge of facts indicating to a reasonable person that he or she had been the victim of a tort. The problem is that nothing in Ms. Bailey's deposition indicates that, as a reasonable person, Ms. Bailey should have known on November 28, 1997, that she personally was the victim of any tortious action on the part of the defendants.
In order to carry their burden of proving that Ms. Bailey had "actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort," defendants cannot focus exclusively on the first factor set forth above. Because the word "tort" includes fault, damages, and causation, defendants had the burden of showing the second factor  that their alleged tortious acts actually produced damage on October 28, 1997, when Ms. Bailey gained knowledge that her unborn child had developed birth defects. This court offered some general principles for determining the date when a tortious act actually produces damage in Harvey. The court found that the "damage suffered must at least be actual and appreciable in quality  that is, determinable and not merely speculative." 593 So.2d at 354. This court has also held that damage is sufficient to commence the running of prescription "only when it has manifested itself with sufficient certainty to support accrual of a cause of action." Cole, 620 So.2d at 1156.
We find that the defendants failed to carry their burden of proving that any damages suffered by Ms. Bailey prior to Jada's birth manifested themselves with sufficient certainty to support accrual of a cause of action. Although Ms. Bailey was naturally upset when she learned that her unborn child had developed birth defects, the real issue is whether any damages Ms. Bailey suffered at that point in time qualify as "actual and appreciable" damages that are determinable, as opposed to speculative damages. Other than her simple statement that she was "messed up" and upset, Ms. Bailey's deposition is silent concerning the impact of learning that her child had birth defects. Thus, the defendants failed to carry their burden of proving that Ms. Bailey's individual cause of action accrued on the date she was told that her unborn child had birth defects.
Prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong. Jordan v. Employee Transfer Corp., 509 So.2d 420, 423 (La.1987). Further, this court has rejected the idea that prescription principles should be used "to force a person who believes he may have been damaged in some way to rush to file suit against all parties who might have caused that damage." Id. Adoption of the arguments presented by the defendants in this case would violate those principles, as well as the other principles discussed herein. Accordingly, we affirm the decision of the lower courts denying the defendants' peremptory exceptions of prescription relative *1286 to Ms. Bailey's individual claim, this in addition to our earlier determination in this opinion that the lower courts did not err in denying defendants' exception of prescription to Ms. Bailey's claim on behalf of Jada.

DECREE
The decisions of the lower courts' denying defendants' peremptory exceptions of prescription are affirmed, and the case is remanded to the district court.
AFFIRMED; REMANDED TO THE DISTRICT COURT.
KIMBALL, J., dissents in part and concurs in part for reasons assigned by VICTORY, J.
VICTORY, J., concurred in part and dissented in part.
KNOLL and WEIMER, JJ., additionally concurred and assigned reasons.
VICTORY, J., concurring in part and dissenting in part.
I concur with the result of the majority opinion holding that prescription on the child's claim does not begin to run until birth. As stated by the majority, La. Civ.Code art. 26 imposes an "implied condition" of live birth on an unborn child's right to be considered a natural person. Therefore, the child's cause of action for damages arising from prenatal injuries does not accrue until the child's live birth.
However, the same cannot be said for the mother's individual claim for damages resulting from this alleged malpractice. Unlike the child's claim, there is no "implied condition" that the baby be born alive in order for the mother to have a claim for damages for mental anguish and other damages suffered by the mother while the baby is in utero. According to Ms. Bailey's deposition, she was informed by at least November 28, 1997 that her baby had developed birth defects and that these birth defects were caused by the use of Depakote ingested early in her pregnancy. She further testified that as a result of this information, she was "messed up" and upset, that she considered having an abortion, despite the fact that she did not believe in abortion, and that her pregnancy was "rough" because she was sick all the time and depressed.
As correctly stated by the majority, determination of when prescription commences under the discovery rule depends on (1) the date on which the plaintiff gained actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort, and (2) the date on which the tortious act actually produces damages. Op. at p. 1284.
The majority ultimately finds that, in order to better serve "the twin goals of consistency and predictability," prescription on both the mother and Jada's separate causes of action should commence on the same date. However, in so doing, the majority ignores the clear statutory and case law on prescription. See La. R.S. 9:5628; Campo v. Correa, 01-2707 (La.6/21/02), 828 So.2d 502; Branch v. Willis-Knighton Medical Center, 92-3086 (La.4/28/94), 636 So.2d 211, 212; Harvey v. Dixie Graphics, Inc., 593 So.2d 351, 354 (La.1992). Further, the majority's holding that the defendants failed to prove that "any damages suffered by Ms. Bailey prior to Jada's birth manifested themselves with sufficient certainty to support accrual of a cause of action" diminishes and trivializes the actual damages suffered by the mother from the time she was informed that, as the result of information obtained from an ultrasound, her baby definitely would suffer birth defects.[1] The fact that she would *1287 suffer further damages after the child was born does not delay the running of prescription. Harvey, supra at 354 ("Thus, in cases in which a plaintiff has suffered some but not all of his damages, prescription runs from the date on which he first suffered actual and appreciable damage, even though he may thereafter come to a more precise realization of the damages he has already incurred or incur further damage as a result of the completed tortious act.")
In this case, after the child was born, Ms. Bailey still had over seven months to file her tort claim. Thus, instead of making exceptions in cases of pre-natal injuries discovered prior to birth, we should, as always, apply the existing law to the facts of the case. Under that law, Ms. Bailey's claim has clearly prescribed.
For the foregoing reasons, I respectfully concur in part and dissent in part.
KNOLL, Justice, concurring.
Although I agree with the majority that the child's cause of action has not prescribed and with its interpretation of La. Civ.Code art. 26 as applying only when the application of the legal fiction of natural personality inures to the benefit of the child as well as its holding on the mother's claim, I additionally concur to comment upon Wartelle v. Women's and Children's Hospital, Inc., 97-0744 (La.12/2/97), 704 So.2d 778,[1] cited in the majority opinion, a decision that was wrongfully decided in my view.
According to our civilian tradition and as noted by the majority opinion, the legal fiction of natural personality should only attach when such application inures to the benefit of the unborn child or for the preservation of the child's interest. Thus, an unborn child should not be treated as having the legal personality of a minor[2] unless such treatment benefits the interests of the child. As the majority opinion correctly finds, because "applying the `legal fiction' to hold that prescription commenced at some point prior to the child's birth when the mother became aware of the existence of its birth defects would not inure either to the benefit of the child or the preservation of its interests," prescription for an action arising out of a tort should commence when the child is born.
With the understanding that the Legislature intended for the legal fiction of natural personality to attach when such application inured to the benefit of the unborn child, I feel it is important to reexamine this Court's holding in Wartelle. In my view, the Wartelle court erred in finding an unborn child does not have a survival action under La. Civ.Code art. 26, because such an action inures to the benefit and preservation of the interests of the unborn child. This is especially true when the evidence establishes that the viable fetus, more probably than not, sustained conscious pain and suffering inflicted by the death-causing tort.
The Louisiana Legislature enacted La. Civ.Code art. 26 in 1987 to codify this court's decision in Danos v. St. Pierre, 402 So.2d 633 (La.1981). Eleni M. Roumel, Wartelle v. Women's & Children's Hospital, Inc.: Denial of Survival and Bystander *1288 Actions for Death of a Stillborn Child, 73 Tul.L.Rev. 399, 401 (1998-1999). In Danos, this court established the right of parents to recover for the wrongful death of their stillborn child who died because of prenatal injuries caused by the negligence of another. Danos, 402 So.2d at 638; Roumel, supra, at 401. Reasoning that the 1981 Civil Code did not implicitly or expressly deny recovery to parents of a stillborn child for a wrongful death action, the Danos court found the parents should be able to recover damages and held that a stillborn child is a "person" for the purposes of bringing a wrongful death action. Danos, 402 So.2d at 639; Roumel, supra, at 402.
Additionally, the Danos court noted the illogic of a rule under which a tortfeasor, who inflicted a more serious injury resulting in death, would not have to pay damages for his tort, while a tortfeasor whose act caused the child to be born alive and disabled would have to pay damages. Danos, 402 So.2d at 638; Roumel, supra, at 403. In its ruling, the Danos court clearly indicated that a tortfeasor should not escape liability merely because his victim died in the womb. Danos, 402 So.2d at 638; Roumel, supra, at 403. Basically, although a stillborn child is considered to have never existed, the fact that the child died in utero "does not condone the fault of a person who caused the loss of the [child]." Roumel, supra, at 401; La. Civ.Code art. 26, cmt. d.
Under the doctrine announced by this court in Danos, "it would be arbitrary and illogical to reward the tortfeasor with immunity from liability because the tortfeasor injured a viable fetus seriously enough to cause its death just before birth, rather than immediately after the birth," when an unborn child would have been born alive, but for its wrongful death. See Wartelle, 97-0744, p. 1 (La.12/2/97), 704 So.2d 778, 785 (Lemmon, J., dissenting). The Legislature apparently agreed. See infra, note 4.
As noted in the Minutes of Meeting of June 2, 1987 of the Senate Committee on Judiciary A, the enactment of La. Civ.Code art. 26 did not seek to change the law, but rather clarify that "if you cause the death of a child through negligence although it is not yet born or is not alive, there may be a cause of action" as recognized by the Danos court.[3] Recognition of a survival action in favor of an unborn child, who is born dead solely because of a tortious injury, is the logical and only correct extension of the doctrine first announced in Danos and codified in La. Civ.Code art. 26.
*1289 Although the logical extension of the Danos ruling would allow parents to bring a survival action for the prenatal injuries suffered by the child itself, this court erroneously restricted the scope of Danos in Wartelle, holding it applicable solely to wrongful death actions. Instead of adhering to its reasoning in Danos as codified in La. Civ.Code art. 26, the Wartelle court wrongfully departed from the framework it had articulated in Danos and focused more upon a strict, textual interpretation of La. Civ.Code art. 26 and, thus, erred by refusing to establish the child's right to a survival action for the child's wrongful death. Accordingly, I find the majority errs in relying upon Wartelle, which in my view was wrongly decided.
WEIMER, J., concurring.
I concur. The decision in this case is in accord with the principle that prescription provisions are construed in favor of maintaining a cause of action. Elevating Boats, Inc. v. St. Bernard Parish, XXXX-XXXX, p. 17 (La.9/5/01), 795 So.2d 1153, 1165, overruled on other grounds by Anthony Crane Rental, L.P. v. Fruge, 03-0115 (La.10/21/03), 859 So.2d 631.
We must follow the law. Parenthetically, I note the decision has a practical effect as well. From the standpoint of ease of administration, commencing prescription on the date of birth represents a discrete, specific, and clear triggering event. Such a result has the virtues of practicality and predictability for an alleged tort, occurring in utero, which often does not involve a discrete, specific date upon which the alleged negligent act and damages occurred. Such a result does not burden a parent or parents with the difficult decision regarding bringing suit during a time when attention should be focused on the pregnancy. Such a result serves to discourage premature suits which would be difficult to pursue until birth or would necessitate dismissal if there was no live birth. Such a result does not unduly burden the defendants with a stale claim given the duration of a pregnancy.
Finally, the parents of a child alleged to be harmed prior to birth are afforded the opportunity to fully assess any damages after birth before deciding whether a suit should be filed.
NOTES
[1] Hutton Brown, Miriam Dent, L. Mark Dyer, Cherie Fuzzell, Lanita Gifford, Sam Griffin, A.G. Kasselberg, M.D., Jayne Workman, and Melinda L. Cooper, "Special Project: Legal Rights and Issues Surrounding Conception, Pregnancy, and Birth," 39 Vand. L. Rev. 537, 605 (1986).
[2] This transformation has been described as follows:

Until recent times, the general rule of law was that in the absence of a statutory provision requiring a different result, a prenatal injury afforded no basis for an action in damages in favor of the child. Today, however, the right of a child to bring suit to recover damages for prenatal injuries tortiously inflicted is broadly recognized, the general rule being that an action may be maintained for such prenatal injuries where the child was subsequently born alive. In this regard, it has been said that the law has come full circle in granting a surviving infant a cause of action for prenatal injuries; where the court previously spoke of the unborn child today it speaks of the unborn plaintiff.
62A Am.Jur.2d Prenatal Injuries; Wrongful Life § 8. See also Roland F. Chase, J.D., Annotation, Liability for Prenatal Injuries, 40 A.L.R.3d 1222, § 2(a), which notes that the law of prenatal injuries has "swung from pole to pole," and describes that swing in great detail, and Beth Driscoll Osowski, "The Need for Logic and Consistency in Fetal Rights," 68 N.D.L.Rev. 171, 1736 (1992).
[3] Salynn Boyles, "Antiseizure Drug Depakote Under Fire: Evidence Linking Depakote to Birth Defects is Mounting," WebMD Health, December 7, 2004, at http://my.webmd.com/content/article/98/104650.htm.
[4] Salynn Boyles, "Seizure Medication Linked to Birth Defects: Problems More Common in Children of Women Taking Depakote," WebMD Health, April 29, 2004, at http://my/webmd.com/content/article/86/99035.htm.
[5] Interestingly, no evidence of record indicates that an amniocentesis was performed on Ms. Bailey to confirm the existence of the suspected birth defects. Our research indicates that an initial maternal serum triple test, followed by high resolution fetal ultrasound and amniocentesis make up a comprehensive diagnosis for spina bifida and other neural tube defects. See "Spina Bifida," WebMD Health, at http:// my.webmd.com/hw/raising_a_family/hw170000.asp; "Amniocentesis," WebMD Health, at http://my.webmd.com/hw/being_pregnant?hw1810.asp.
[6] This condition has been described as follows:

A neural tube defect (NTD) is a birth defect that occurs when the spine, the brain, or the bone and skin that protect them do not develop properly. The neural tube is the part of a developing fetus that grows into the spinal cord and brain. Normally, the bones of the skull and spine grow around the brain and spinal cord, and then skin covers the bones. A neural tube defect occurs when this process doesn't happen normally.
"Neural Tube Defect," WebMD Health, at http://my.webmd.com/hw/health_ guideatoz/stn 166112.asp?navbar=hw198129. Spina bifida is the most common neural tube defect. Id.
[7] Valproic acid is apparently one of the ingredients in prescription Depakote. Exposure to valproic acid by a fetus can cause a "rare congenital disorder" called Fetal Valproate Syndrome. "Fetal Valproate Syndrome," WebMD Health, at http://my.webmd.com/hw/raising_a_ family/nord1007.asp."Symptoms of this disorder may include spina bifida, distinctive facial features, and other musculoskeletal abnormalities." Id.
[8] Cornelia de Lange syndrome is "a rare genetic disorder that is apparent at birth." "Cornelia de Lange," WebMD Health, at http://my.webmd.com/hw/raising_a_family/nord30.asp. "Associated symptoms and findings" of Cornelia de Lange typically include the following:

delays in physical development before and after birth (prenatal and postnatal growth retardation); characteristic abnormalities of the head and facial (craniofacial) area, resulting in a distinctive facial appearance; malformations of the hands and arms (upper limbs); and mild to severe mental retardation."
Id.
[9] "Spina bifida is a birth defect in which the bones of the spine (vertebrae) do not form properly around the spinal cord." "Spina bifida," WebMD Health, at http://my.webmd.com/hw/raising_a_family/hw169958.asp. The most severe form of spina bifida, spina bifida manifesta, "often is associated with nerve damage that can result in problems with walking, bladder control, and coordination." Id.
[10] "Congenital hydrocephalus is a buildup of excess of cerebrospinal fluid (CSF) within the brain that is present at birth." "Congenital hydrocephalus," WebMD Health, at http:// my.webmd.com/hw/raising_a_family/hwl98129.asp. "The excess fluid can increase pressure in the baby's brain, possibly resulting in brain damage and loss of mental and physical abilities." Id.
[11] Ms. Bailey filed a motion to consolidate the tort claim against the pharmacies with the medical malpractice discovery proceeding against the health-care providers in the district court to which the tort action had been assigned; that motion was signed ex parte. However, Dr. Khoury later filed a motion asking the district court to which the medical malpractice discovery proceeding had been assigned to reconsider Ms. Bailey's motion to consolidate, citing the fact that the motion to consolidate had not been set for contradictory hearing and stating that Ms. Bailey did not object to rescission of the consolidation order. The district court denied Dr. Khoury's ex parte motion, noting that the motion had to be set for contradictory hearing. Despite the apparent consolidation, the prescription exceptions filed by the medical malpractice defendants were decided by a different district court judge than the prescription exceptions filed by the tort defendants. At some point, the cases were consolidated; however, it is unclear from the record when the consolidation actually occurred.
[12] For simplicity's sake, this opinion will refer to all of the objections to Ms. Bailey's claims based on prescription as "exceptions of prescription." That term includes Eckerd's motion for summary judgment based on prescription.
[13] See Brown v. E.I. Dupont De Nemours & Co., 820 A.2d 362 (Del.2003); LaBello v. Albany Medical Center Hospital, 85 N.Y.2d 701, 628 N.Y.S.2d 40, 651 N.E.2d 908 (1995); Blake v. Cruz, 108 Idaho 253, 698 P.2d 315 (Id.1984); Wilson v. Kaiser Foundation Hospitals, 141 Cal.App.3d 891, 190 Cal.Rptr. 649 (3d Dist.1983); Simmons v. Weisenthal, 29 Pa. D. & C.2d 54 (Pa.Com.Pl.1962).
[14] See Provenzano v. Integrated Genetics, 22 F.Supp.2d 406 (D.N.J.1998); Urland v. Merrell-Dow Pharmaceuticals, Inc., 822 F.2d 1268 (3d Cir.1987).
[15] See 40 A.L.R.3d 1222, § 4.
[16] Wartelle involved parents of a stillborn child who wanted to maintain a survival action. We ultimately rejected the plaintiffs' claims for survival damages, in a divided opinion by a panel that did not include Justice Knoll. As indicated in her additional concurring reasons herein, Justice Knoll disagrees with the result in Wartelle.
[17] This law review article criticizes the decision of a New York intermediate appellate court in LaBello v. Albany Medical Center Hospital, 200 A.D.2d 299, 614 N.Y.S.2d 459 (3d Dept.1994), rev'd, 85 N.Y.2d 701, 628 N.Y.S.2d 40, 651 N.E.2d 908 (1995). The article points out the logical fallacies in the intermediate appellate court's holding that the statute of limitations on a medical malpractice action arising out of prenatal injures commenced on the date prior to the birth when the malpractice was committed.
[1] Under the majority's analysis, Ms. Bailey will presumably not be able to recover damages for her "mental and physical anguish endured, past, present and future," as alleged in her complaint, for any portion of that mental and physical anguish suffered before the child was born.
[1] I did not participate in the Wartelle decision because I was recused, having participated in that decision in the court of appeal, Third Circuit, prior to my election to the Supreme Court.
[2] La. Civ.Code art. 3468 provides: "Prescription runs against absent persons and incompetents, including minors and interdicts, unless exception is established by legislation."
[3] Professor A.N. Yiannopoulos, the reporter for the Louisiana State Law Institute committee for the revision of the Louisiana Civil Code of 1870, Book I, explained the purpose of the act was to "restructure the first part of Book I of the Civil Code that deals with `Persons'," because "Articles 24 through 36 of the present Civil Code contains [sic] obsolete materials pertaining to the differences between the sexes." Yiannopoulos further explained:

This bill would delete the old articles and place them in modern language. The only change in the law is the admission of the fact that there can be a wrongful death action for the death of an unborn child. This really isn't anything new, because in the last 30 or 40 years we have had it in the books. There have been decisions of the Louisiana Supreme Court that recognize a cause of action for the death of an unborn. It has nothing to do with abortion, and it has nothing to [do] with criminal law. All this provision deals with is the idea that for the purposes of civil law, a child is considered to have been in existence since its conception. That law really is part of Louisiana law since the Code of 1808. In connection with this idea, if you cause the death of a child through negligence although it is not yet born or is not alive, there may be a cause of action.
See Minutes of Meeting of June 2, 1987 of the Senate Committee on Judiciary A.